**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| **DANNY P MONROE** | **CASE NO. 6:25-CV-01043** |
| **VERSUS** | **JUDGE DRELL** |
| **COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

# REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, the Court recommends that the Commissioner's decision be reversed and remanded for further administrative action.

## Administrative Proceedings

Claimant, Danny Monroe, fully exhausted his administrative remedies before filing this action in federal court. On December 2, 2015, Claimant filed his initial Title II application for disability insurance benefits, alleging disability beginning on January 26, 2009. That claim was denied on August 30, 2016, and no appeal was made. On or about April 24, 2017, Claimant filed an application for supplemental security income ("SSI") benefits. On December 28, 2018, the Administrative Law Judge ("ALJ") found that Claimant had been under disability as defined by the Social Security Act since the date the application was filed, April 24, 2017. That decision

was ultimately reversed and remanded. On September 15, 2020, the ALJ again found that Claimant had been disabled since April 24, 2017. Claimant continues to receive SSI benefits.

Pertinent to the present matter, Claimant filed a new application for Title II disability insurance benefits on August 10, 2020, alleging disability beginning on January 26, 2009. (Rec. Doc. 6-1, pp. 31). His application was denied on May 26, 2022, and upon reconsideration on September 14, 2023. He then requested a hearing, which was held on July 10, 2024, via telephone before ALJ Devona Able. The ALJ issued a decision on September 18, 2024, concluding that Claimant has not been under disability within the meaning of the Social Security Act from January 26, 2009, through the date last insured, December 31, 2014. (*Id*. at p. 32). Claimant requested that the Appeals Council review the ALJ's decision, but the Appeals Council found no basis for review. (Rec. *Id*. at p. 8). Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of judicial review. *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005). Claimant then initiated this action, seeking review of the Commissioner's decision. The question is whether Claimant was disabled within the meaning of the Social Security Act from January 26, 2009, through the date last insured, December 31, 2014.

## Summary of Pertinent Facts

Claimant was born on February 16, 1968. (Certified Administrative Record "CAR", p. 42). He was 40 years old on the alleged disability onset date and 46 years old at the time he was last insured. (*Id.* at p. 48). He completed 9th grade and last worked in 2009. (*Id.* at p. 50). Claimant stopped working because of a work-related shoulder injury. (*Id.*). As a result of his shoulder injury, he had multiple surgeries. (*Id.* at 51). Per Claimant, following his injuries, his doctors restricted him from working, and he was unable to work during the relevant time period (January 26, 2009, through December 31, 2014). (*Id.*, & at p. 56). Claimant testified that he had no strength, was unable to lift and grab things, and wore a sling from 2009 to 2011. (CAR, p. 52). During that time, he required assistance with dressing, cooking, cleaning, yard work, and struggled to drive. (*Id.* at p. 52-53). Claimant spent the majority of his time in a recliner, including for sleep, because he could not get out of bed. (*Id.* at p. 53-54). Per Claimant, he does not really know how to type and was unable to write due to his injury. (*Id.* at p. 54). Claimant was recommended for another shoulder and carpel tunnel surgery but has been unable to get it due to insurance coverage issues. (*Id.* at p. 56). Claimant testified that he also has three slipped discs and kidney problems. (*Id.* at p. 58).

The medical records during the relevant time period (January 26, 2009, to December 31, 2014) in the record reveal the following pertinent history:

- On January 27, 2009, Claimant was 74 inches tall, weighed 330 pounds, with a BMI of 42.4. During his examination, Dr. Gidman noted that Claimant was "severely obese." (CAR, p. 566).

- MRI imaging in 2009 showed an almost complete tear of the supraspinatus tendon, marked bony and soft tissue hypertrophy at the acromioclavicular joint suggesting significant should impingement, and probably Hill-Sachs deformity of the superior lateral humeral head, suggesting possible prior dislocation. (*Id*. at p. 558).

- Claimant underwent right shoulder arthroscopic subacromial decompression, labral debridement and open rotator cuff repair on February 11, 2009.

- From March 2009 to August 2009, Dr. Vizzi limited Claimant to sedentary work with limited use of affected extremity, limited bending, squatting, claiming, and lifting. (*Id*. at p. 747).

- On August 11, 2009, Dr. Vizzi opined that it would be a good idea to get Claimant back to some limited work duty so he could get back into the frame of mind of working and released Claimant to light work with limited use of affected extremity, limited bending, squatting, claiming, and lifting. (*Id*. at p. 758)

- Claimant underwent a right shoulder manipulation under general anesthesia with lysis of inferior capsular adhesion followed by an injection of the joint with Marcaine on December 15, 2009. Claimant was diagnosed with rotator cuff disease, impingement and arthrofibrosis of the right shoulder. (*Id*. at pp. 852 & 1006).

- MIR imaging in April 2010 showed the impression of a full-thickness tear of the infraspinatus tendon posteriorly, tendonitis versus a tiny tear of the supraspinatus, and postoperative changes. Claimant was diagnosed with acromioclavicular joint degeneration, degeneration impingement in the right shoulder and a tear in the inferior portion of the rotator cuff. (*Id*. at p. 803).

- In May 2010, Claimant was noted as moving the arm and shoulder very slowly and as having pain with abduction. Claimant also complained of

decreased strength in his right arm and was recommended for surgery to explore the rotator cuff on the right, decompress the acromioclavicular joint by shaving it inferiority, and possible repair of rotator cuff. (CAR, p. 825).

- From at least February 2010 to May 2010, Claimant was deemed unable to work pending treatment by Dr. Cobb at Lafayette Bone & Joint Clinic. There are other Work Status Reports dating back to September 2009; however, the pertinent note is redacted. (*Id*. at p. 894-905)

- On April 5, 2011, Dr. Vizzi with Orthopaedic Surgery & Sports Medicine issued a medical opinion recommending that Claimant undergo another surgery due to an apparent new tear. Per Dr. Vizzi, Claimant would need to undergo therapy afterwards and would need a functional capacity evaluation to determine his long-term function capabilities if not better after 9 to 12 months. It was Dr. Vizzi's opinion that it takes 9 to 12 months to fully recover from the recommended surgery. (*Id*. at p. 1262).

- Following multiple appointments with the Lafayette Bone & Joint Clinic throughout 2010 and 2011, on October 20, 2011, Claimant underwent another surgery to remove the exostosis from the clavicle resulting in a postoperative diagnosis of impingement tendinitis due to downward sloping acromion and exostosis, as well as exostosis from inferior aspect of clavicle, and a normal rotator cuff. MRI imagining in 2012 showed no evidence of a rotator cuff tear. (*Id*. at p. 943)

- In 2012, Claimant began receiving treatment for depression at the Psychiatric Associates of Lafayette, LA. It was opined that he has Major Depressive Disorder directly and causally due to his work released right shoulder injuries and will require continued medical and psychiatric treatment indefinitely. (*Id*. at p. 1116).

- From January 25, 2012, to at least August 5, 2013, Claimant was deemed unable to work pending treatment by Dr. Sledge, III, at Lafayette Bone & Joint Clinic. (*Id*. at p. 1131-1146).

- On May 9, 2013, Michael Duval, M.D. at Louisiana Orthopedic Specialists ("LOS") reviewed Claimant's history and opined that it appears Claimant has a deltoid detachment over the anterior acromion as a result of the last

surgery performed. He noted that a surgical repair could afford some improvement in pain and function, but it is also possible that it wouldn't help him at all. He noted that Claimant's prognosis is guarded. (CAR, p. 534-535).

- On February 5, 2014, Claimant presented to the Lafayette Bone & Joint Clinic with complaints of shoulder pain. He rated his pain as 7 out of 10 and aggravated by movement. Claimant was noted as having profound weakness of the right rotator cuff. Claimant was noted as having significant pain and dysfunction. (*Id*. at p. 589).

- On May 5, 2014, Claimant presented to the Lafayette Bone & Joint Clinic with complaints of shoulder pain. Plaintiff was recommended for an MR arthrogram but no longer has insurance. Claimant was noted as having continued rotator cuff dysfunction.

- MRI imagining from June 2014 revealed a partial supraspinatus tear greater than 50%, and up to 80%, thickness. There was also evidence of a previous rotator cuff repair and significant changes at the AC joint. Dr. Stubbs recommended an arthroscopy of the right shoulder with rotator cuff repair, subacromial decompression, and distal clavicle resection as well as carpal tunnel release. (*Id*. at pp. 602 & 1286).

- Claimant presented at Lafayette Bone & Joint throughout 2014. He described his pain as moderate with sharp stabbing pain. Claimant was attempting to get insurance to cover the recommended surgeries to no avail.

On December 28, 2018, ALJ Lawrence Ragona found that Claimant suffered from the severe impairments of dysfunction of the right upper extremity and residual effects of shoulder surgery and obesity and has been under a disability since April 24, 2017. (*Id*. at p. 89). He found that Claimant had the residual functional capacity to perform sedentary work with limitations and found that no jobs exist in significant numbers in the national economy that Claimant could perform. (*Id*. at pp. 89-91). In

reaching these conclusions, the ALJ reviewed the medical records noted above, as well as more current records. On December 4, 2019, the matter was remanded for the ALJ to respond to Claimant's request to reopen his prior case and give further consideration to Claimant's RFC. (*Id.* at pp. 111-113). On remand, the ALJ again found Claimant to be disabled.

In the present matter, at the July 10, 2024 hearing, the Vocational Expert opined that an individual between the ages of 40 and 46 with no past relevant work who is limited to light work and can perform occasional reaching with the right upper extremity and frequent handling with the right upper extremity could perform two unskilled occupations: an usher and counter clerk. (CAR, p. 60-61). When given the same hypothetical but at the sedentary exertional level, the Vocational Expert found only one occupation this individual could perform, semiconductor bonder, but noted that the estimated nationwide employment was very low. (*Id.* at p. 62-63). The Vocational Expert found that this job would be eliminated if the individual was limited to no overhead reaching with the right upper extremity and only occasional handling and fingering with the right upper extremity. (*Id.* at p. 63-64). Lastly, the Vocational Expert found that an individual who needs two extra 15-minute breaks during the workday or would be off task at least 20% of the workday or would be absent at least two days per month would not be capable of performing any work in the national economy. (*Id.* at p. 64-65)

The ALJ found that Claimant had the following severe impairments: right carpal tunnel syndrome and right rotator cuff tear with subsequent tendon ruptures. The ALJ found that Claimant's obesity and depression were non-severe impairments. Nonetheless, the ALJ found Claimant was not disabled through the date last insured and had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except he was limited to occasional reaching with the right upper extremity and frequent handling with the right upper extremity. Claimant now seeks reversal of the Commissioner's adverse ruling.

## **Analysis**

### A. **Standard of Review**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a

'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Id.* (citations omitted).

The Commissioner's findings must be affirmed as conclusive when they are supported by substantial evidence. 42 U.S.C. § 405(g); *Martinez*, 64 F.3d at 173. In determining whether the Commissioner's findings are sufficiently supported, a court must carefully examine the entire record but cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa*, 895 F.2d at 1022. To that end, the court may not re-assess credibility or independently resolve conflicts in the evidence. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education, and work experience. *Wren*, 925 F.2d at 126.

**B. <u>Entitlement to Benefits</u>**

The Disability Insurance Benefit program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. See 42 U.S.C. § 423(a). *See also Smith v.*

*Berryhill*, 139 S. Ct. 1865, 1772 (2019). SSI provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled. 42 U.S.C. § 1382(a)(1) & (2). *See also Smith*, 139 S. Ct. at 1772. A person is disabled "if [s]he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled if her physical or mental impairment or impairments are so severe that she is unable do her previous work and considering her age, education, and work experience, cannot participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if she applied for work. 42 U.S.C. § 1382c(a)(3)(B).

### C. <u>Evaluation Process and Burden of Proof</u>

A sequential five-step inquiry is used to determine whether a claimant is disabled. The Commissioner must determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do

the kind of work she did in the past; and (5) can perform any other work. 20 C.F.R. § 404.1520.

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity by determining the most the claimant can still do despite her physical and mental limitations based on all relevant evidence in the record. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 404.1545(a)(1). The claimant's residual functional capacity is used at the fourth step to determine if she can still do her past relevant work and at the fifth step to determine whether she can adjust to any other type of work. 20 C.F.R. § 404.1520(e).

While the claimant bears the burden of proof on the first four steps, the Commissioner assumes the burden on the fifth and must show that the claimant can perform other substantial work in the national economy. *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga*, 810 F.2d at 1302. If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir.

1994), cert. den., 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

## D. The ALJ's Findings and Conclusions

The ALJ determined at step one that Claimant has not engaged in substantial gainful activity from his alleged onset date of January 26, 2009, through his date last insured of December 31, 2014. (CAR, p. 27). This finding is supported by substantial evidence in the record.

At step two, the ALJ found that Claimant has the following severe impairments: right carpal tunnel syndrome and right rotator cuff tear with subsequent tendon ruptures. (*Id*.). Claimant challenges this finding to the extent he challenges the finding that Claimant's obesity was a non-severe impairment.

At step three, the ALJ found that Claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (*Id*. at p. 28).

The ALJ found that through the date last insured, Claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except he was limited to occasional reaching with the right upper extremity and frequent handling with the right upper extremity. (*Id*.). Claimant challenges this finding.

At step four, the ALJ found that although Claimant "has worked in the past, his work activity was not performed at situational gainful activity within the five

years prior to the date last insured. Therefore, it would not meet the requirements of past relevant work." (*Id*. at p. 32). This finding is supported by substantial evidence in the record.

At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Claimant could have performed through the date he was last insured. (*Id*.). Claimant challenges this finding to the extent he challenges the ALJ's RFC finding.

**E. <u>The Allegation of Error</u>**

Claimant alleges the ALJ erred in finding that Claimant had the RFC to perform light work with exceptions, in finding that Claimant's obesity was non-severe, and by failing to take into account the limitations and restrictions caused by his obesity in assessing his RFC. Claimant also alleges the ALJ erred in finding that he could perform work on a regular sustained basis and in finding that a significant number of jobs existed in the national economy that Claimant could have performed.

**F. <u>Whether the ALJ properly assessed Claimant's RFC</u>**

Claimant challenges the ALJ's RFC finding that he was capable of performing light work with the exception of being limited to occasional reaching with the right upper extremity and frequent handling with the right upper extremity from January 26, 2009, through December 31, 2014 (the pertinent time period for this determination). Specifically, Claimant alleges that the ALJ's findings are

inconsistent with the two prior administrative decisions, medical evidence and testimony, and is not supported by substantial evidence. (Rec. Doc. 11, p. 3).

A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record." *Perez*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)). The ALJ is responsible for determining a claimant's residual functional capacity. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). In making a finding in that regard, the ALJ must consider all the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations. *Martinez*, 64 F.3d at 176. The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983). In making a residual functional capacity assessment, an ALJ must consider all symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. The ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not severe. *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

Here, the ALJ ruled that during the relevant time, July 2009 to December 2014, Claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except he was limited to occasional reaching with the right upper extremity and frequent handling with the right upper extremity. (28). Per 20 CFR 404.1567(b):

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

In determining such, the ALJ found that "[C]laimant's medically determinable impairments could reasonably be expected to cause symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (CAR, p. 29). While the ALJ details Claimant's prior surgeries and need for more surgery, complaints of pain, and treating provider's work status updates to the worker's compensation insurer wherein they note that Claimant was unable to work, the ALJ dismisses those updates as "temporary in nature," found that they "do not reflect the claimant's functional abilities during the entire period under review," and notes that said updates are not a "function-by-

function assessment" and are thus "neither valuable nor persuasive." (*Id*. at pp. 31-32). The ALJ relied mostly on the assessments from the State agency physicians. James Crout, M.D., Johnny Craig, M.D., Gerald Dzurik, M.D., and George L. Cross, M.D., each found that, through December 2014, Claimant could perform light work with no more than occasional reaching with the right arm. Dr. Crout found that Claimant could handle frequently.

Claimant contends that this case requires a remand as a matter of law because the ALJ's findings are inconsistent with the two prior administrative decisions, medical evidence and testimony, and are not supported by substantial evidence. (Rec. Doc. 11, p. 3). Specifically, Claimant notes that "[t]here is nothing in the record showing that [Claimant's] condition worsened from 2014 to 2017 that would warrant inconsistent and contrary results in this case" and that the ALJ erred in finding that Claimant's obesity was non-severe and thus failing to take into account the limitations and restrictions caused by his obesity. (*Id* ar p. 7.). Claimant also questions the ALJ's finding that he could perform work on a regular sustained basis and in finding that a significant number of jobs exist in the national economy that Claimant could have performed.

The Court agrees with Claimant that it is difficult to reconcile the prior ALJ finding of disability and sedentary RFC with the findings at issue and finds that the ALJ erred when she failed to explain why she reached a different conclusion despite

reviewing the same medical records. Indeed, when reviewing the prior ALJ's decision, Claimant appears more able from 2014 to 2017 than 2009 to 2014 when he was undergoing multiple surgeries and physical therapy.

On September 15, 2020, ALJ Lawrence Ragona determined that Claimant had the RFC to perform sedentary work except he can perform no work above the shoulder with his right upper extremity; and he can only occasionally handle and finger with the right upper extremity. He found no limitation in the left upper extremity. (CAR, p. 119). He made such a finding, in part, after reviewing the same records detailed above. (*Id*. at pp. 119-120). The prior ALJ also found Claimant's obesity to be a severe impairment, despite it slightly improving from 2014 to 2017:

> The undersigned also notes that the claimant's obesity compounds his overall physical condition. In 2009, he stood 74 inches tall and weighed 330 pounds, when Gregory Gidman, M.D., evaluated him for Worker's Compensation purposes. This calculated to a BMI of 42.4 kg/m2. He noted the claimant was "severely obese." Upon application for Title XVI benefits, he weighed 328 pounds for a BMI of 42.1 kg/m2. In June 2017, medical records indicated he stood 74 inches tall and weighed approximately 324 pounds, which equates to a body mass index (BMI) of 41.6 kg/m2. The claimant's BMIs satisfy the requirement for obesity.

(*Id*. at p. 120).

The ALJ went on to find that Claimant's "weight has a profound effect on his ability to perform exertional and postural functions. Considering the effect of obesity in combination with his shoulder dysfunction, the claimant's obesity reduces his ability to perform work activity down to the sedentary exertional level. (*Id*).

Compare this finding to the present finding: "[t]here is no evidence of any limitations due to the claimant's obesity in the claimant's reports or in the medical evidence during the period under review; rather, the limitations pertain to his right upper extremity." (*Id*. at p. 27).

Again, the Court cannot reconcile the two findings based on the same evidence. While the ALJ is not bound by the prior ALJ's findings, the Court finds that the ALJ's present findings are not supported by substantial evidence, in part because the ALJ dismissed the opinions of Claimant's treating physicians at Lafayette Bone & Joint, Orthopaedic Surgery & Sports Medicine, and Louisiana Orthopaedic Specialists in favor of the State agency physicians without the proper analysis.

The Fifth Circuit has held that an ALJ is required to consider each of the Section 404.1527(d) factors before declining to give any weight to the opinions of the claimant's treating specialist. *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). Social Security Administration ("SSA") Regulations provide that the SSA "will always give good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion" and list factors that an ALJ must consider to assess the weight to be given to the opinion of a treating physician when the ALJ determines that it is not entitled to controlling weight. *See* 20 C.F.R. § 404.1527(c)(2). Specifically, this regulation requires consideration of:

(1) the physician's length of treatment of the claimant,
(2) the physician's frequency of examination,
(3) the nature and extent of the treatment relationship,
(4) the support of the physician's opinion afforded by the medical evidence of record,
(5) the consistency of the opinion with the record as a whole; and
(6) the specialization of the treating physician.

Here, from at least February 2010 to May 2010, Claimant was deemed unable to work pending treatment by Dr. Cobb at Lafayette Bone & Joint Clinic. There are other Work Status Reports dating back to September 2009; however, the pertinent note is redacted. (CAR, p. 894-905). Then from January 25, 2012, to at least August 5, 2013, Claimant was deemed unable to work pending treatment by Dr. Sledge, III, at Lafayette Bone & Joint Clinic. (*Id*. at pp. 1131-1146). While the ALJ is certainly permitted to find differently when weighing the evidence, they are required to perform the mandatory analysis required by *Newton* and 20 C.F.R. § 404.1527(c)(1)-(6). Here, the ALJ dismisses Claimant's treating physicians' opinions as "temporary in nature," found they "do not reflect the claimant's functional abilities during the entire period under review," and notes that said updates are not a "function-by-function assessment" and are thus "neither valuable nor persuasive." (*Id*. at pp. 31-32). The ALJ, however, failed to perform the 20 C.F.R. § 404.1527(c)(1)-(6) analysis. While Claimant failed to explicitly raise this argument, the Court recognizes that under *Newton*, this analysis is mandatory. *Newton*, 209 F.3d at 456

("The ALJ failed to perform this analysis, which should be conducted on remand."). Accordingly, remand is recommended.

**G. Whether the ALJ properly considered Claimant's obesity**

As discussed above, the ALJ found that "[t]here is no evidence of any limitations due to the claimant's obesity in the claimant's reports or in the medical evidence during the period under review; rather, the limitations pertain to his right upper extremity." (27). The ALJ Social Security Ruling ("SSR") 02-1p recognizes that "[f]or adults, both men and women, the Clinical Guidelines describe ... a [body mass index ('BMI') ] of 30.0 or above as 'obesity.' " SSR 02-1p, *Titles II and XVI: Evaluation of Obesity*, 2002 WL 34686281, at *2 (Sept. 12, 2002). The ruling also expressly acknowledges that obesity can cause functional limitations in sitting, standing, walking, lifting, carrying, pushing, pulling, climbing, stooping, crouching, manipulating, as well as the ability to tolerate extreme heat, humidity, or hazards. SSR 02-1p, 2002 WL 34686281, at *6. Thus, although obesity is not a listed impairment, it can reduce an individual's occupational base for work activity in combination with other ailments. See *Holt v. Saul*, No. 4:19-CV-01894, 2020 WL 2549346, at *3 (S.D. Tex. May 19, 2020); *McGee v. Astrue*, No. H-10-575, 2011 WL 11048325, at *3 (S.D. Tex. Feb. 25, 2011). Because it can have such a wide range of effects on a claimant, obesity must be considered at all steps of the sequential evaluation process. SSR 02-1p, 2002 WL 34686281, at *3. See, also, e.g.,

*Holt v. Saul*, 2020 WL 2549346, at *3; *Perkins v. Berryhill*, No. 4:18-CV-664-A, 2019 WL 2997082, at *2 (N.D. Tex. June 21, 2019), report and recommendation adopted, 2019 WL 2996055 (N.D. Tex. July 9, 2019).

Here, there is ample evidence that Claimant had problems sitting, standing, walking, lifting, carrying, pushing, pulling, climbing, stooping, crouching, and/or manipulating. *See* SSR 02-1p, 2002 WL 34686281, at *6. While the evidence and medical records mostly reference these limitations when discussing Claimant's shoulder injury, his obesity should have been "considered at all steps of the sequential evaluation process" in combination with his shoulder dysfunction in determining whether is reduces his ability to perform work activity. *Id.* at 3. Accordingly, remand is recommended.

## **<u>Conclusion and Recommendation</u>**

For the foregoing reasons, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to again evaluate Claimant's residual functional capacity as provided in the foregoing analysis. Inasmuch as the reversal and remand recommended herein falls under sentence four of Section

405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act ("EAJA").[1]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[2]

---

[1] See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

[2] See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).

Signed in Lafayette, Louisiana, this 27th day of, 2026.

CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE